### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| EVELYN ROSA,<br>    *Plaintiff*,<br><br>      v.<br><br>ANDREW SAUL, COMMISSIONER OF<br>SOCIAL SECURITY ADMINISTRATION,<br>    *Defendant*. | No. 3:18-cv-1976 (VAB) |

### RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Evelyn Rosa ("Plaintiff") has filed an administrative appeal under 42 U.S.C. § 405(g) seeking review of the Commissioner of Social Security's[1] ("Defendant" or the "Commissioner") decision denying her disability insurance benefits. Ms. Rosa has moved to reverse the Commissioner's decision, while the Commissioner has moved to affirm its decision.

For the following reasons, the motion to reverse the Commissioner's decision is **DENIED**, and the motion to affirm the Commissioner's decision is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Administrative Procedural History

On May 31, 2016, Ms. Rosa, then fifty-one years of age, protectively filed a Title II application for disability and disability insurance benefits claiming that she was disabled under the Social Security Act ("SSA") beginning March 18, 2015, due to various ailments, including degenerative disc disease, hepatitis C, diabetes, hypertension, heart disease, fibromyalgia,

---

[1] This role is currently filled by Andrew Saul, who is automatically substituted as a party under Rule 25(d) of the Federal Rules of Civil Procedure.

hyperlipidemia, lung disease, depression, and sleep apnea. Tr. at 15, 77–78, ECF No. 11 (June 24, 2019). The claim initially was denied on August 23, 2016, and denied upon reconsideration on April 6, 2017. *Id.* at 92–100.

On May 19, 2017, while represented by an attorney[2] (John Serrano), Ms. Rosa filed a written request for a hearing. *Id.* at 103–07.

On May 11, 2018, Administrative Law Judge ("ALJ") Edward F. Sweeney held a hearing in Hartford, Connecticut. *Id.* at 141–47, 178–79. Ms. Rosa and a vocational expert, Dennis J. King, testified. *Id.* at 15, 172.

On May 31, 2018, ALJ Sweeney denied Ms. Rosa's claim for disability benefits, finding that she was not disabled under the Social Security Act from March 18, 2015 through the date of that decision. *Id.* at 15–24. Ms. Rosa requested review of this decision and also requested more time before the Appeals Council acted on her case. *Id.* at 9 (letter from Appeals Council dated August 10, 2018, indicating it would not act for twenty-five days).

On March 11, 2019, the Appeals Council denied her request for review, thereby making the ALJ's decision the Commissioner's final decision. *Id.* at 1–8.

## 2. **Activities of Daily Life and Hearing Testimony**

Ms. Rosa lives with her husband, has a high-school education, and has no vocational training. Tr. at 36. Before filing for disability benefits, Ms. Rosa claimed to have worked for nineteen years as a teacher's assistant at a church's nursery school. *Id.* at 36–37. Sometimes, she also assisted with "office work" on an as-needed basis. *Id.* at 37–38, 43–44. Ms. Rosa was "let go" for an incident where a child under her supervision was unaccounted for during a count. *Id.* at 38.

---

[2] Ms. Rosa had retained the services of John Serrano of the Serrano Law Firm, LLC in West Hartford, CT. Tr. at 118.

Ms. Rosa claims she is unable to work due to pain from "[n]ot being able to barely walk for long periods of time or sit down;" "depress[ion] throughout the years;" and fibromyalgia, which "makes it difficult for [her] to move around." *Id.* at 38–39.  Her daily activities involve praying, watching TV, reading, and doing crossword puzzles. *Id* at 40. If she is able to do so, she sweeps and does dishes; her husband helps with everything else. *Id.* Her pain medications help the pain a little, but "certain days . . . [are] worse than others." *Id.*

According to Ms. Rosa, before being "let go," she was "out of work" a lot of the time because of her pain, and she had to be taken to the emergency room twice. *Id.* at 41–42. During the last couple of years that she was working, she was out from work one to three times a month. *Id.* at 42. Ms. Rosa claims she missed work due to her pain or her low immune system, which caused her to get sick if the children were sick. *Id.* at 43.

In addition to general pain, Ms. Rosa also has pain in her right wrist, which prevents her from various cooking tasks, like "[c]utting meat." *Id.* at 44. Her wrist had been bothering her for three months at the time of the hearing. *Id.* at 46.

Sometime in 2015, Ms. Rosa's doctor suggested she get a cane to help with her mobility, but Ms. Rosa did not get one until a year before the hearing, sometime in 2017. *Id.* at 47–48. Ms. Rosa claims she has had "many falls in the past" and suffers from a herniated disc due to a fall sometime before 2013. *Id.* at 48–49. Ms. Rosa uses the cane now when she gets out, depending on whether she has difficulty moving around that day. *Id.* at 49–50. Ms. Rosa has difficulty lifting and finds a gallon of milk to be too heavy to walk around with. *Id.* at 51. Ms. Rosa did physical therapy at least twice, and she found "pool therapy" to be "awesome" and "great." *Id.*

Ms. Rosa concluded her testimony at the hearing with the following:

> [I]t's not that I don't want to work. What limits me is the pain and not being able to move most of the time. If there can be anything

3

> that can help me out, I have no problem, but I don't—I'm afraid that if I go to work and I work one day and be the rest of the week out because of the pain and not be able to move, am I going to lose my job? That's all I worry about.

*Id.* at 53.

Mr. King, the vocational expert witness, testified that Ms. Rosa previously worked a composite job: The work she performed as an office clerk was performed at the light level, with a Specific Vocational Preparation rating of two, and the work she performed as a teacher's aide was performed at the light level, with a Specific Vocational Preparation rating of three. *Id.* at 55.

In response to ALJ Sweeney's first hypothetical regarding an individual with Ms. Rosa's limitations,[3] Mr. King testified that such a person could perform Ms. Rosa's past work, either as a composite job or each job individually. *Id.*

In response to ALJ Sweeney's second hypothetical of an individual with the same limitations as well as "requir[ing] the use of a cane for ambulation," Mr. King testified that the workplace for a teacher's aide would require an accommodation. *Id.* at 55–56. Mr. King opined that this second hypothetical individual could perform a variety of "work station job[s] where [one] can ambulate to a work station." *Id.* at 56. Mr. King testified that this individual could thus work as a survey worker, information clerk, or fund raiser. *Id.*

In response to ALJ Sweeney's third hypothetical of an individual with the same limitations as the first and second hypothetical individuals and limited to a range of work defined as sedentary, Mr. King testified that such an individual could not perform Ms. Rosa's past work, either the composite job or the individual components. *Id.* at 57.

---

[3] An individual limited to light level work, with occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; frequent balancing; and occasional stooping, kneeling, crouching, and crawling. Tr. at 55.

4

When Mr. Serrano, Ms. Rosa's then-counsel, modified the second hypothetical by including the additional limitation of occasional fingering and handling, Mr. King responded that the only work such an individual could perform would be that of the information clerk. *Id.* at 58. Mr. King further testified that if such an individual was out of work once a month, that would only be "an irritant," but "[t]wice a month is when they show you the door." *Id.* at 59. Mr. King included in his "twice a month" calculus when the individual is out of work, leaves more than an hour early, or arrives more than an hour late. *Id.*

At the time of the hearing, Ms. Rosa was fifty-three years old and living with her husband and puppy. *Id.* at 34–35.

### 3. Material Medical History and Chronology

Dr. Elizabeth Appel was Ms. Rosa's primary care physician at UCONN Health, and treated Ms. Rosa for hepatitis C, back pain, coronary artery disease, and diabetes. Tr. at 268–385; 407–74. As of April 20, 2018, Dr. Appel had prescribed nine medications for Ms. Rosa to treat issues related to her pain, diabetes, high blood pressure, high cholesterol, thyroid, and diabetes. *Id.* at 267.

#### i. Pain treatment

On February 1, 2013, through a referral from Dr. Appel, physical therapists at Hartford Hospital Rehabilitation Network ("Hartford Rehab") established a plan of care for Ms. Rosa involving twice-weekly physical therapy for her fibromyalgia and degenerative disc disease. *Id.* at 498, 528–30. A couple of days later, on February 3, 2013, Ms. Rosa rated her "current pain 3/10." *Id.* at 499.

On February 20, 2013, Ms. Rosa rated her "current pain 4/10," but the physical therapist, Robin Kirsche, noted that "pain is relieved in pool." *Id.* at 503–04.

On February 25, 2013, Ms. Rosa rated her "current pain 5/10" but reported "relief from pain while in pool." *Id.* at 505–06. In fact, her "pain post [aquatic therapy] treatment [was] 0/10." *Id.* at 506.

On March 8, 2013, the physical therapist, Latasha Raineault, updated Ms. Rosa's plan from twice-weekly aquatic therapy to "1 day in pool, 1 day on land." *Id.* at 512.

On March 11, 2013, Ms. Rosa initially rated her "current pain 3/10," and "pain post treatment [was] 2/10." *Id.* at 513–14.

Ms. Rosa continued physical therapy about twice weekly until April 8, 2013, with sometimes varying responses to treatment but mostly "progressing towards goals as expected." *Id.* at 524; *see also id.* at 515–26 (containing treatment notes).

From December 23, 2015 to June 21, 2017, after a referral by Dr. Appel, Ms. Rosa was treated as an outpatient at Mount Sinai Rehab Hospital ("Mount Sinai") for pain especially in her back. *Id.* at 654–705. Ms. Rosa was recommended physical therapy twice weekly for six weeks, including electrical stimulation and aquatic therapy. *Id.* at 658. Thomas Gostyla, Physical Therapist, noted that her "condition has potential to improve." *Id.*

On June 21, 2017, Joanne Lombardo, Physical Therapist, noted that "[o]verall this patient made improvement sice [sic] starting [physical therapy,]" and her "pain level reduced from 10/10 to 4–5/10." *Id.* at 704. Ms. Rosa's "[f]unctional mobility has improved with self care," and although she "did mot [sic] attend her last session of [physical therapy]," she reported "she will continue." *Id.*

### ii.  Depression treatment

On March 30, 2016, Ms. Rosa began treating her depression at Community Health Resources Genesis Center ("Community Health"). *Id.* at 611. Pratima Upadhyay, Licensed

6

Professional Counselor, completed the intake form. *Id.* at 611–18. Based on the intake, the therapist indicated Ms. Rosa's risk "towards self is low," and "[h]er risk to harm others is low." *Id.* at 616. Ms. Rosa was described as well groomed, maintaining good eye contact, having an intact thought process, but with a depressed mood. *Id.* Ms. Rosa was diagnosed with unspecified depressive disorder, and scheduled for individual therapy "to learn healthy coping skills to deal with depressive thoughts." *Id.* at 616–17.

From March 30, 2016 through February 13, 2018, Ms. Rosa remained on a plan of individual therapy biweekly for at least the next three months. *Id.* at 611–32. During this treatment, Ms. Rosa did not progress in learning healthy coping skills, and her Global Assessment of Functioning (GAF) score had only increased from 53 to 57. *Compare id.* at 617 (Mar. 30, 2016), *with id.* at 631 (Feb. 13, 2018).

### iii.   Sleep apnea treatment

From June 12, 2017 to March 15, 2018, Dr. Prashant Grover treated Ms. Rosa for obstructive sleep apnea and shortness of breath. *Id.* at 634–53. For her initial assessment, "a complete pulmonary function test . . . show[ed] mild restrictive lung disease and mild reduction in diffusion capacity likely secondary to obesity, no evidence of asthma or obstructive lung disease." *Id.* at 638. Dr. Grover also noted that she had "recovered from her episode of acute bronchitis, [and] there is no clinical evidence of pulmonary hypertension or interstitial lung disease." *Id.*

Dr. Grover first noted that Ms. Rosa's usage of a Continuous Positive Airway Pressure ("CPAP") machine "has been very intermittent," *see id.* at 638 (June 12, 2017), and on September 25, 2017, "[h]er compliance with CPAP ha[d] decreased significantly," *id.* at 639, and she was not using her CPAP as directed, *id.* at 644.

7

On March 15, 2018, Dr. Grover noted that Ms. Rosa's compliance with CPAP had improved, but she still had not reached 70% usage as instructed, despite her sleep apnea improving when she uses a CPAP. *Id.* at 645, 650.

### 4. Medical Opinions

On June 28, 2016, Christine Grant, Licensed Professional Counselor, Ms. Rosa's treating therapist, completed a medical source statement, but indicated that she had not known Ms. Rosa "long enough to comment" on her activities of daily living, social interactions, or task performances. *Id.* at 389–91. Ms. Grant described Ms. Rosa as "dressed appropriately . . . groomed well . . . [and] good hygiene." *Id.* at 388.

On July 26, 2016, Dr. Russell Phillips, a non-examining state agency psychologist, considered Ms. Rosa's available medical records, including an intake note from her psychotherapist at Community Health, and determined that there was "no documentation of any sustained severe mental impairments." *Id.* at 70. According to Dr. Phillips, Ms. Rosa had "mild" limitations in her activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; and persistence or pace. *Id.*

On August 6, 2016, Dr. Gil Freitas, a non-examining state agency expert, undertook a consultative examination and concluded the following:

> The patient is a 51-year-old female with a history of breast cancer, hepatitis C, coronary artery disease requiring stenting and hiatal hernia. The patient gave great cooperation throughout the exam. The patient had normal range of motion. The patient had no limitations in her ability to walk short or long distances. No limitations in the ability to sit, stand, or walk. No limitations in ability to lift and carry. She did have rotations in bending, stooping, and crouching. The patient had lack of balance and was unable to walk on her heels and that slightly decreased mobility in terms of bending, stooping, and crouching. The patient had no manipulative limitations. No visual or communicative limitations. The patient does have chest pain and

> given her history of stenting as well as nitroglycerin response it is
> suggested of angina.

*Id.* at 406.

On August 22, 2016, Dr. Rafael S. Wurzel, a non-examining state agency expert, considered the available medical evidence and records, and concluded that Ms. Rosa could occasionally, or fifteen to thirty-nine percent of the time, lift or carry up to twenty pounds; frequently, or forty to sixty-nine percent of the time, lift or carry up to ten pounds; sit, stand, or walk for about six hours in an eight-hour workday, including normal breaks; and could push or pull without any other limitations. *Id.* at 72. In addition, he concluded that Ms. Rosa could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; and frequently balance. *Id.* Finally, he determined that Ms. Rosa did not have manipulative, visual, communicative, or environmental limitations, and that she had the residual functional capacity to perform work at the light level. *Id.* at 72, 74.

On October 25, 2016, Ms. Grant, Ms. Rosa's therapist, completed another medical source statement, and indicated that Ms. Rosa "has had minimal response [to treatment] as she continues to struggle with her health." *Id.* at 475. Ms. Grant's description of Ms. Rosa was consistent with before—noting that Ms. Rosa was "well groomed, [had] good hygiene & appropriate clothing"— but struggled with activities of daily living "due to [her] report of no motivation [and] pain." *Id.* at 476. Ms. Grant concluded that Ms. Rosa "sometimes" had a problem (or "reduced ability") in: (1) taking care of personal hygiene; (2) carry for her needs (dressing, eating., etc.); (3) using appropriate coping skills; (4) handling frustration appropriately; (5) carrying out multistep instructions; (6) focusing long enough to finish simple activities or tasks; (7) performing basic activities at a reasonable pace, and; (3) persisting in simple activities without interruption from psychological symptoms. *Id.* at 477–78.

Ms. Grant also found that Ms. Rosa had an "average" ability in: (1) using good judgment regarding safety and dangerous circumstances; (2) interacting appropriately with others; (3) asking questions or requesting assistance; (4) respecting/responding appropriately to others in authority;(4) getting along with others without distracting them or exhibiting behavioral extremes; (5) carrying out single-step instructions, and; (6) changing from one simple task to another. *Id.* Ms. Grant also determined that Ms. Rosa was capable of handling her own funds. *Id.* at 479; *see also id.* at 482–84, 534–633 (treatment notes). Ms. Grant's medical source statement was also co-signed by the supervising physician. *Id.* at 479.

On April 4, 2017, Dr. Lindsay Harvey, a non-examining state agency psychologist, considered the available medical evidence and records and determined that Ms. Rosa had "mild" limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. *Id.* at 84.

On April 5, 2017, Dr. Firooz Golkar, a non-examining state agency expert, also considered Ms. Rosa's medical records and drew the same conclusions as to Ms. Rosa's residual functional capacity as Dr. Wurzel drew—essentially, that Ms. Rosa could perform work at the light level with the specified limitations. *Id.* at 86–87.

### 5.  ALJ Decision

On May 31, 2018, after careful consideration of the entire record, ALJ Sweeney denied Ms. Rosa's claims. Tr. at 12–24.

ALJ Sweeney made seven factual and legal conclusions in his decision:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019. *Id.* at 17.

2.  The claimant has not engaged in substantial gainful activity since March 18, 2015, the alleged onset date. *Id.*

3.  The claimant suffers from the severe impairment of degenerative disc disease of the lumbar spine. *Id.* at 17–19.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. *Id.* at 20.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R 404.1567(b) except she can occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance; and occasionally stop, kneel, crouch, and crawl. *Id.* at 20–23.

6.  The claimant is capable of performing past relevant work as a composite job of office clerk and teacher's aide. *Id.* at 23. The work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. *Id.*

7.  The claimant has not been under a disability, as defined in the Social Security Act, from march 18, 2015, through the date of this decision. *Id.* at 24.

The Appeals Council denied Ms. Rosa's request for review, finding that her reasons for disagreeing with ALJ Sweeney's decision "do not provide a basis for changing the [ALJ]'s decision." *Id.* at 1. As a result, ALJ Sweeney's decision became the final, appealable decision of the Commissioner sixty-one days after it issued. Tr. at 2.

### B.  Procedural Background

On April 22, 2019, Ms. Rosa filed a *pro se* Complaint against Nancy A. Berryhill, then-Acting Commissioner of Social Security, to appeal ALJ X's decision denying her disability

11

benefits. Compl., ECF No. 1 (Apr. 22, 2019). Ms. Rosa also filed a motion for leave to proceed *in forma pauperis*, which was granted by Magistrate Judge Sarah. A. L. Merriam. Order, ECF No. 7 (Apr. 24, 2019).

On June 24, 2019, the Commissioner filed the relevant Social Security Transcripts. Tr., ECF No. 11 (June 24, 2019).

On September 9, 2019, Ms. Rosa moved to reverse the Commissioner's decision. Mem. in Supp. of Mot. to Remand or Reverse, ECF No. 13 (Sept. 9, 2019) ("Pl.'s Mem.").

On October 22, 2019, the Commissioner moved to affirm its final decision. Def.'s Mot. for an Order Affirming the Decision of the Comm'r, ECF No. 14 (Oct. 22, 2019) ("Comm'r's Mot."); Def.'s Responsive Statement of Facts, ECF No. 14-1 (Oct. 22, 2019) ("Def.'s SMF"); Def.'s Mem. in Supp. of Comm'r's Mot., ECF No. 14-2 (Oct. 22, 2019) ("Comm'r's Mem.").

## II.     STANDARD OF REVIEW

Under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x. 721, 722 (2d Cir. 2018) (summary order) (citing 20 C.F.R. § 404.1505(a)).

To determine whether a claimant is disabled, the ALJ must follow a five-step evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the

national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)). "[T]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four," *see Burgess*, 537 F.3d at 128 (internal quotation marks and citation omitted), with Step Five "the burden shift[ing] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). A district court can reverse the commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay*, 562 F.3d at 507 (internal quotation marks and citations omitted). "[A district court] must

consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x. 401, 403–04 (2d Cir. 2011) (summary order) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted).

To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

Complaints and filings filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

## III.   DISCUSSION

Ms. Rosa raises four claims of error: (1) the ALJ accorded insufficient weight to the opinions of her primary treating sources; (2) the ALJ did not specifically consider the side effects

from her medication; (3) the ALJ failed to include the full scope of her limitations in his hypotheticals to the vocational expert; and (4) the ALJ was not properly appointed at the time the hearing was held, rendering the decision unlawful.

### A. The Development of the Administrative Record

An ALJ has an "affirmative duty to compile a complete record" when ruling on eligibility. *Brown*, 174 F.3d at 63. The ALJ must "not only develop the proof but carefully weigh it." *Donato v. Sec'y of Dep't of Health and Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983). Accordingly, the district court conducts "a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). In cases "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the district court will not substitute its "judgment for that of the commissioner." *Veino*, 312 F.3d at 586. And the district court may not "affirm an administrative action on grounds different from those conducted by the agency." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

### 1. Treating Physician Rule

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek*, 802 F.3d at 375. As to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek*, 802 F.3d at 375; *see also Burgess*, 537 F.3d at 128.

As part of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). There are, however, cases where the treating physician should not be provided controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (holding that "the option of treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in support, such as the opinions of other medical experts").

The Second Circuit also has cautioned ALJs from "rely[ing] heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013); *see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (justifying giving a consultative physician limited weight "because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons'" (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988))). At the same time, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also*

16

*Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) (summary order) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial evidence").

Although an "ALJ's conclusions would not be defective if he requested opinions from medical sources and the medical sources refused," that is only the case if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34–35 (2d Cir. 2013); *see Holt v. Colvin*, No. 3:16-cv-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) ("Indeed, courts within this circuit have remanded when the ALJ failed to request a medical source statement from a treating physician and the medical record contained no assessments of the claimant's functional limitation." (collecting cases)).

Whether or not a treating physician's opinion is necessary is a case-specific inquiry that "focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015)); *see also DeLeon v. Colvin*, No. 3:15-cv-01106 (JCH), 2016 WL 3211419, at *4 (D. Conn. June 9, 2016) ("assessing whether it was legal error for an ALJ to fail to request a medical source statement from a claimant's treating physician is a case-specific inquiry").

 Ms. Rosa argues that the ALJ "gave little weight to the opinions of" her treating physician, Dr. Appel, "whose records included plaintiff's functional limitations," namely that the records "indicated she could not walk or care for herself and needed the help of her husband to support her daily activities." Pl.'s Mem. at 2. Ms. Rosa contends that ALJ's failure to give more

17

weight, if not controlling weight, to Dr. Appel's opinion warrants reversal of his decision for not being based on substantial evidence. *Id.* at 6.

In response, the Commissioner submits that Dr. Appel "did not issue a medical assessment as that term is defined" under 20 C.F.R. § 404.1527(a), but instead "presented treatment notes, which supported the [residual functional capacity] for light work." Comm'r's Mem. at 5. The Commissioner emphasizes the numerous normal physical examinations (and a normal psychiatric exam on March 31, 2016) in Dr. Appel's records. *Id.* at 5–6. In addition, the Commissioner points to Dr. Grover's treatment notes as supporting Ms. Rosa's residual functional capacity, particularly the June 12, 2017 examination, which "showed normal effort and breath sounds, no stridor, no respiratory distress, no wheezes, and decreased breath sounds, bilaterally." *Id.* at 6 (citing Tr. at 638). Beyond the treating physician records, the Commissioner argues that "the actual medical assessments in the record supported the [residual functional capacity] for light work." *Id.* at 6–10.

The Commissioner thus contends that the ALJ "reasonably and correctly assigned 'great weight' to the well-supported medical assessments from Drs. Phillips, Harvey, Wurzel, and Golkar," *id.* at 8 (citing Tr. at 23), and "partial weight" to Ms. Grant's assessment, *id.* at 10 (citing Tr. at 10), in concluding that Ms. Rosa had the residual functional capacity for light work. According to the Commissioner, "Ms. Rosa failed to carry her burden of providing medical and other evidence to support her claim that she was disabled." *Id.*

The Court agrees.

Here, the ALJ accorded "great weight" to the opinions of the non-examining state experts: Drs. Phillips, Wurzel, Harvey, and Golkar. Tr. at 23. In addition, the opinion of consultative examiner Dr. Freitas was accorded great weight, and the opinion of Ms. Grant—Ms.

Rosa's treating therapist—was accorded partial weight. *Id.* As the Commissioner notes, all of these opinions support the ALJ's determination of Ms. Rosa's residual functional capacity of light, because the medical opinions agreed that Ms. Rosa could work with the stated limitations, in large part due to the fact that her pain was manageable. *Id.* at 20–23.

In this case, as the Commissioner has argued, Dr. Appel did not complete a medical source statement, but instead supplied treatment notes, *see* Comm'r's Mem. at 5, so there was no medical source statement to consider. More importantly, the treatment notes of Ms. Rosa's treating physicians, including Dr. Appel, support the conclusion that Ms. Rosa has the residual functional capacity for light work.

First, despite treating Ms. Rosa for various chronic health issues, Dr. Appel's treatment notes indicate normal findings with respect to numerous physical examinations from October 2013 to May 2016. *See* Tr. at 278 (normal findings with respect to respiratory, cardiovascular, vascular, and abdomen examinations on May 3, 2016); *id.* at 272 (normal findings with respect to constitutional, eyes, respiratory, cardiovascular, abdomen, and psychiatric examinations on March 31, 2016); *id.* at 285 (normal findings with respect to constitutional, neck, respiratory, and cardiovascular examinations on March 4, 2016); *id.* at 289 (same for November 17, 2015); *id.* at 294 (same for July 13, 2015); *id.* at 298 (same for April 8, 2015); *id.* at 303 (normal findings with respect to constitutional, neck, respiratory, cardiovascular, and neurological examinations on March 4, 2015); *id.* at 308 (normal findings with respect to constitutional, eyes, ears, nasopharynx, neck, breast, respiratory, cardiovascular, vascular, abdomen, skin, musculoskeletal, extremity, neurological, and psychiatric examinations on February 20, 2015); *id.* at 312–13 (normal findings with respect to constitutional, neck, respiratory, and cardiovascular examinations on September 30, 2014); *id.* at 318 (normal findings with respect to constitutional,

neck, respiratory, and cardiovascular examinations on May 23, 2014); *id.* at 324 (normal findings with respect to constitutional, eyes, ears, nasopharynx, neck, breast, respiratory, cardiovascular, vascular, abdomen, skin, musculoskeletal, extremity, neurological, and psychiatric examinations on April 15, 2014); *id.* at 337–38 (normal findings with respect to constitutional, eyes, ears, nasopharynx, neck, breast, respiratory, cardiovascular, vascular, abdomen, skin, musculoskeletal, extremity, neurological, and psychiatric examinations on October 11, 2013).

Second, Dr. Grover, who treated Ms. Rosa for sleep apnea, noted that her compliance with CPAP (a machine used to treat sleep apnea) was "intermittent." *Id.* at 634. Ms. Rosa's non-compliance persisted from June 12, 2017, *id.*, to September 25, 2017, and March 15, 2018. *Id.* at 643–44, 648–49. When Ms. Rosa did comply with physician instructions, her sleep apnea improved. *Id.* at 645, 650.

Third, the medical record shows that when Ms. Rosa attended physical therapy, her pain improved. Ms. Rosa first attended physical therapy from February to April 2013, when treatment notes indicated that she was "progressing towards goals as expected." *Id.* at 524. Although during her first session on February 1, 2013, treatment notes indicated she was "unable to stand [or sit] greater than 30 minutes without pain . . . unable to walk 45 minutes without pain[] and fatigue . . . [and] unable to ascend[] and descend [one] flight of stairs without pain[] and fatigue," *id.* 528, significantly, Ms. Rosa consistently indicated "relief from pain" during and after aquatic therapy. *See, e.g.*, *id.* at 506; *see also id.* at 515–26 (containing treatment notes). Ms. Rosa most recently attended physical therapy on June 21, 2017, when treatment notes indicated that she has "made improvement" since starting physical therapy, with her "pain level reduced from 10/10 to 4-5/10." *Id.* at 704. Consequently, the available treatment notes in the record and the medical source statements constitute substantial evidence for the ALJ to conclude that "the medical

record documents that [Ms. Rosa's variety of chronic health problems] . . . are well controlled with treatment." *Id.* at 22; *see id.* at 20–22 (discussing the medical record).

Finally, although Ms. Rosa raises no issues with Ms. Grant's assessment as her treating therapist, the Court emphasizes that Ms. Grant's medical source statement further supports the conclusions of the medical assessments that were accorded great weight. Despite her unspecified depressive disorder, Ms. Grant assessed that Ms. Rosa had an average ability with most activities of daily living, but a better than average ability to use good judgment regarding safety and dangerous circumstances, *id.* at 477; average ability with social interactions, *id.* at 478; and a reduced ability with many task performances and average ability in others, *id.* Finally, Ms. Grant determined that Ms. Rosa was capable of handling her own funds. *Id.* at 479. Along with the conclusion of the non-examining state psychologist, Dr. Harvey, these assessments constitute substantial evidence for the ALJ to conclude that Ms. Rosa's "depression does not cause more than minimal limitation in her ability to perform basic mental work activities." *See id.* at 18.

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). In cases "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the district court will not substitute its "judgment for that of the commissioner." *Veino*, 312 F.3d at 586. And the district court may not "affirm an administrative action on grounds different from those conducted by the agency." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

The ALJ here did not violate the treating physician rule; his determinations were based on substantial evidence, which were supported by treatment notes.

### 2.  ALJ's Assessment of Medication Side Effects

Ms. Rosa also argues that the ALJ erred in failing to consider her strong medications and their side effects. Pl.'s Mem. at 6.

The Commissioner responds by noting that Ms. Rosa never indicated to the Commissioner before the hearing that her medication caused any side effects, nor did she testify about this issue at the hearing. Comm'r's Mem. at 11. As a result, Ms. Rosa "failed to meet her burden to prove that her medication side effects were disabling." *Id.*

The Court agrees.

The ALJ cannot consider anything that is not in the record, and here, Ms. Rosa herself indicated that she had no side effects to her many medications. *See* Tr. at 244 (indicating on her Appeal Form SSA-3441 "NONE" or "N/A" with respect to sixteen medications prescribed by Dr. Appel). Nor did Ms. Rosa, who was represented by counsel at the hearing, testify to any issues with side effects. *See id.* at 29–61 (hearing testimony).

As a result, because "the threshold for [substantial evidence] is not high," and there is no evidence to support Ms. Rosa's arguments here as to her medication's side effects, the existing administrative record contains "sufficient evidence" to support the ALJ's conclusions. *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." (internal quotation marks omitted)).

Accordingly, because the ALJ's findings are based on substantial evidence in the record, with treatment notes and medical source statements all supporting his conclusion as to Ms. Rosa's residual functional capacity, the Court finds that Ms. Rosa has failed to meet her burden of proving that she is disabled under the Social Security Act.

### B.  The ALJ's Vocational Findings

Step Five of the disability analysis shifts the burden to the Commissioner "to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x. 724, 276 (2d Cir. 2009) (summary order) (internal citations omitted). To meet the burden of Step Five under the Social Security regulations, "[t]he Commissioner need show only one job existing in the national economy that [the claimant] can perform." *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)).

Ms. Rosa submits that "the ALJ never considered the limitations that plaintiff possessed that would limit her ability to do the jobs cited." Pl.'s Mem. at 7. According to Ms. Rosa, Dr. Appel's medical records support her limitations, but the vocational expert never had this information to consider. *Id.*

In response, the Commissioner argues that Ms. Rosa's arguments are meritless, because "Dr. Appel's treatment notes supported the [residual functional capacity] for light work." Comm'r's Mem. at 11.

The Court agrees.

Here, Drs. Wurzel and Golkar both concluded that Ms. Rosa could (1) occasionally lift or carry up to twenty pounds; (2) frequently lift or carry up to ten pounds; (3) sit, stand, or walk for about six hours in an eight-hour workday, including normal breaks; (4) push or pull without any other limitations; (5) occasionally climb ramps, stairs, ladders, ropes, or scaffolds; (6) occasionally stoop, kneel, crouch, or crawl; and (7) frequently balance. Tr. at 72, 85–86. They

23

also determined that Ms. Rosa did not have manipulative, visual, communicative, or environmental limitations, and that she had the residual functional capacity to perform work at the light level with the stated limitations. *Id.* at 72–74, 86–87.

Based on these assessments, the ALJ asked Mr. King, the vocational expert, whether someone with Ms. Rosa's limitations could perform her past relevant work as a teacher's aide and office clerk, either individually or as a composite of work, as actually performed. Tr. at 54–55. Mr. King testified that such a person could perform Ms. Rosa's past relevant work. *Id.* at 55. This was the case even if the individual required the use of a cane, which Ms. Rosa did not use consistently—and if not, Mr. King testified that this individual could work as a survey worker, information clerk, or fund raiser. *Id.* at 55–56.

Contrary to Ms. Rosa's assertions, Dr. Appel's treatment notes do not indicate additional functional limitations for the reasons already explained. In addition, as explained above, much of Ms. Rosa's chronic issues can be managed, *see, e.g.*, *id.* at 704 (physical therapist indicating that Ms. Rosa's "[f]unctional mobility has improved with self care," but she did [n]ot attend her last session"); but Ms. Rosa has not consistently adhered to treatment or physician's instructions, *see, e.g.*, *id.* at 47–48 (Ms. Rosa testifying that a doctor suggested she get a cane "three years ago" but she "only got it about one year ago" before the hearing).

In this case, given the residual functional capacity assessments of Drs. Golkar and Wurzel and the substantial evidence in the record supporting the residual functional capacity finding, the ALJ's vocational findings were proper.

### C.  The ALJ's Appointment

Finally, Ms. Rosa contends that "the ALJ was not properly appointed at the time of the hearing, [so she] is entitled to a new hearing." Pl.'s Mem. at 8 (citing *Lucia v. SEC*, 138 S. Ct. 2044 (2018)).

In response, the Commissioner submits that Ms. Rosa never presented the argument that the ALJ was not constitutionally appointed, and thus her "failure to assert a challenge to the ALJ's appointment before the agency at any point in the administrative proceedings forfeited her Appointments Clause claim." Comm'r's Mem. at 11-12 (citations omitted). According to the Commissioner, Ms. Rosa's failure to assert a timely challenge renders this argument "forfeited for purposes of federal court review." *Id.* at 14.

The Court agrees.

Ms. Rosa's reliance on *Lucia* is misplaced. Although *Lucia*[4] allowed for a new hearing after finding that the ALJ in question was not properly appointed, the Supreme Court emphasized that only "'one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." 138 S. Ct. at 2055 (quoting *Ryder v. United States,* 515 U.S. 177, 182-83 (1995)). Unlike the petitioner in *Lucia*, who made a timely challenge by contesting the validity of the ALJ's appointment throughout the administrative process, *see id.* at 2050 (explaining how the petitioner first made this argument on appeal to the SEC), Ms. Rosa did not timely challenge ALJ Sweeney's appointment.

Despite *Lucia*'s generally-accepted applicability to Social Security ALJs, as this Court has previously held, "Social Security claimants are entitled to a *Lucia* rehearing, only if they

---

[4] In *Lucia*, the Supreme Court answered "the sole question" at issue regarding the status of the Securities and Exchange Commission's ("SEC") ALJs, and held that the SEC's ALJs were not employees, but were inferior officers subject to the Appointments Clause of the United States Constitution. 138 S. Ct. at 2051–55.

raised their Appointments Clause arguments during their agency hearing or appeal." *Johnson v. Berryhill*, No. 3:17-cv-1651 (VAB), 2019 WL 1430242, at *14 (D. Conn. Mar. 29, 2019). Ms. Rosa was represented by counsel until her appeal to this Court. *See* Tr. at 1–8 (indicating the Appeals Council's denial of Ms. Rosa's request for review received from John Serrano, Esq.); *see also id.* at 118 (Social Security Claim Fee Agreement form signed by Ms. Rosa and her attorney, Mr. Serrano).

Accordingly, because Ms. Rosa failed to raise her Appointments Clause argument during her agency hearing or appeal, the Court finds that she has failed to preserve this argument for appeal here.

## IV.    CONCLUSION

For the reasons explained above, the Court **DENIES** the motion to reverse the Commissioner's decision, and **AFFIRMS** the motion to affirm the Commissioner's decision.

The Clerk of Court is directed to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of April, 2020.

   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge